```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
```

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>           **Plaintiff,**<br><br>     **v.**<br><br>**LARRY HOOVER, a/k/a "The Chairman," "The King",**<br><br>           **Defendant.** | **Case No. 95 CR 508-1**<br><br>**Judge Harry D. Leinenweber** |

## ORDER

Defendant Larry Hoover's Motion for Relief Under the First Step Act (Dkt. No. 1232) is denied without prejudice to refile.

## STATEMENT

In May 1997, Larry Hoover ("Hoover") was convicted by a jury on all forty counts against him in the operative superseding indictment. The superseding indictment charged Hoover with being the leader of a continuing criminal enterprise known as the Gangster Disciples from approximately 1970 to 1995. *United States v. Hoover*, 246 F.3d 1054, 1056 (7th Cir. 2001). Under Hoover's direction, the gang sold "great quantities of cocaine, heroin, and other drugs in Chicago." *Id.* Although convicted on forty counts, only the following sentences remain at the time of this order: (1) a mandatory life imprisonment on the continuing criminal

enterprise under 21 U.S.C.§ 848; (2) a non-mandatory concurrent life sentence on use of a minor in drug operations under 21 U.S.C. § 861(a)(1); (3) a non-mandatory concurrent life sentence for possession with intent to distribute or distribution of a controlled substance under 21 U.S.C. § 841(a)(1); and (4) a mandatory five-year additional sentence under 18 U.S.C § 924(c).

On December 21, 2019, Hoover filed this Motion for relief. (Dkt. No. 1232.) Hoover moves the Court to use its discretion to impose a reduced sentence as set forth in the Fair Sentencing Act as retroactively applied under the First Step Act. In his Motion, Hoover focused on his eligibility under the First Step Act and asked for a further hearing regarding the applicable sentencing guidelines. The Motion otherwise only noted that Hoover had been incarcerated on these charges for 25 years and was approaching age 70. (*Id*. at 3.) The Government responded, arguing that the Court lacked discretion to resentence Hoover. (Dkt. No. 1258.) The Government also argued that Hoover's crimes, encompassing over two decades of crime and corruption while Hoover was serving a life sentence in state prison, were uniquely in need of continued Federal incarceration. (*Id.*) Further, the Government argued that Hoover's disciplinary history with the Federal Bureau of Prisons indicated a lack of rehabilitation. (*Id.*)

Hoover responded, stating that he had only been subject to eight infractions while in Federal custody. (Dkt. No. 1264.) Hoover noted that most of his infractions happened over twenty years ago, when Hoover was still adjusting to life at an ADX Supermax security prison. (*Id.* at 11.) Of the more recent infractions, Hoover alleged that these were due to inadvertent and incidental references to his past or innocent conversations that were interpreted negatively by staff. (*Id.* at 15–17.) Hoover then described the conditions of his current confinement, which include spending 20 to 24 hours per day locked alone in his cell, a room approximately seven by twelve feet, with a concrete bed, desk, stool, and combination sink and toilet. (*Id.* at 12.) Hoover noted he was unable to see anything from his single window other than a building and the sky. (*Id.*) To show rehabilitation, Hoover pointed to the fact that he had become a voracious reader and has completed 100 (later amended to 1,000) hours of educational courses. (*Id.* at 11.) Because Hoover has been housed in severe isolation in ADX Supermax, he argued he was unable to demonstrate further rehabilitation beyond educational study. (*Id.*)

As part of its response, the Government also moved for oral argument before this Court. (Dkt. No. 1245.) On July 15, 2020, the Court granted the motion and limited the argument to the question of whether the Court should use its discretion to resentence

Hoover. (Dkt. No. 1280.) At the end of the proceedings, the Court requested additional briefing from both parties on whether the Illinois Department of Corrections ("IDOC") was secure enough to prevent Mr. Hoover from returning to gang activities should he be released into State of Illinois custody. (Dkt. Nos. 1283, 1284.)

In response, Hoover submitted a brief informing the Court that, since Hoover's conviction, the IDOC has developed a Central Intelligence Unit to identify, track, and investigate gang members. (Dkt. No. 1287.) Hoover also argued that, as a 70-year-old man, he would no longer be in a position to influence persons 40 or 50 years younger than him. (*Id.* at 4.) Instead, Hoover argued that there is "no reasonable basis to suppose Mr. Hoover retains some kind of residual, hierarchal authority over anyone." (*Id.*) Hoover additionally argued that gangs are no longer as centralized as they were when Hoover was in charge of his criminal enterprise. (*Id.*) Instead gangs are now comprised of smaller, neighborhood-based cliques. (*Id.*)

The Government also filed a supplemental response. (Dkt. No. 1286.) In it, the Government warned the Court that it could not rely on the Illinois life sentence as Hoover would be eligible to go before the Illinois Prisoner Review Board and could point to the Court's current resentencing as a reason to grant Hoover relief. (*Id.* at 2.) Further, the Government advised that the IDOC

provided a letter describing Hoover would present "unique challenges for which enhanced security measures and increased resources cannot guarantee personal safety." (*Id.* at 10.) IDOC's letter declared its intention either to partner with the BOP or a sister State to house Hoover if he entered state custody and noted that it had a preliminary agreement with the BOP to continue Hoover's state sentence with them, if necessary. (*Id.* at 10–11.) The Government also provided the Court with an Illinois Parole Board interview from 2014, where Hoover explained his prior criminal activity as follows:

> During the course of his interview, inmate Hoover stated that he ordered the murder of Mr. William Young, but he did not shoot and kill Mr. Young on the evening of February 26, 1973. When asked why he ordered the murder of Mr. Young, inmate Hoover refused to answer the question.
>
> As to the murder of Mr. Joshua Shaw, inmate Hoover denies the shooting or the ordering there of Mr. Joshua Shaw. Inmate Hoover stated that Mr. Shaw was at risk in life being involved in narcotics sales.
>
> As to his involvement in the Gangster Disciples Street Gang, inmate Hoover stated that he was one of the principle organizers of the [sic] in the creation [sic] street gang. When question as to his current participation and involvement, inmate Hoover denied any involvement or level of participation. He further stated that the organization that he created had been dismantled and is no longer the same organization. Inmate Hoover finally stated that he was convicted in the media for crimes he never committed because the media painted a distorted picture of him.

(IPRB Minute Sheets at 6, Supp. on Illinois Custody, Ex. G, Dkt. No. 1286-7.) In response, Hoover filed a rebuttal, alleging "a parade of false narratives" as to Hoover's actions and impact. (Dkt. No. 1288-1.) Hoover noted that he had gotten reprimanded by the Federal Bureau of Prisons for talking about reissuing the "Blueprint," and then denied that "the Blueprint [was] subversive." The Blueprint is a book describing Larry Hoover and the origin of the Gangster Disciples, which downplays the street gang's violent acts and drug distribution network. Jerry Thomas and Andrew Martin, Gang Writing New Chapters in Trying to Gain Legitimacy, The Chicago Tribune, (Sept. 19, 1996) *https://www.chicagotribune.com/news/ct-xpm-1996-09-19-9609190041 -story.html*. Instead, the Blueprint recasts Hoover and the Gangster Disciples' actions as beneficial to the community, as part of a "continuing effort to portray themselves in a positive light." *Id.* Hoover also argued that the IDOC had been fully capable of housing other "notorious" inmates safely and thus minimized IDOC's letter of concerns and further argued that Hoover's eventual request for parole should be of no concern to this Court. (Rebuttal at 2.)

On August 12, 2020, the Court requested a second supplemental briefing on the Federal Bureau of Prisons procedures regarding Hoover's current location in the highest security risk prison. In

his briefing, Hoover described the "Step Down" Program, which allows prisoners to receive fewer and fewer restrictions until the prisoner is eligible to be transferred to a regular federal penitentiary. (Dkt. No. 1299.) Hoover stated that he has "never been moved along" in the program. (*Id.* at 3.) Although Hoover has not requested to move down, Hoover stated that "he has been told informally and repeatedly that a transfer to a less restrictive facility was not going to happen." (*Id.*) There have been eleven requests at Hoover's prison since 2015, ten have been rejected, and "no one spoke of an appeal." (*Id.* at 3-4.) As such, Hoover characterized the program as rare, arbitrary, and political. (*Id.*)

The Government filed briefing which informed the Court that Hoover's designation was not subject to judicial review under 18 U.S.C. § 3621(b). The Government noted that there was an Administrative Remedy Program that "allow[s] an inmate to seek formal review of an issue relating to any aspect of his/her own confinement" but that Hoover had not yet filed a grievance challenging his designation. (Dkt. No. 1298, quoting BOP Program Statement 1330.18, available at *https://www.bop.gov/policy/progstat/1330_018.pdf*). In addition to this voluminous briefing, the Government filed one additional supplement in February 2021. (Dkt. No. 1310.) In it, the Government provided information from a 2014 indictment that the Gangster

Disciples continued to celebrate Larry Hoover's birthday yearly, and that members of the Gangster Disciples were, at a minimum, purporting to be appointed by Larry Hoover and attempting to communicate with him in ADX Supermax. (*Id.*) Having seriously considered the issues presented, the Court now rules on the Motion.

Enacted in 2010, the Fair Sentencing Act reduces sentencing disparities between offenses involving crack and powder cocaine. Public Law 111–220; 124 Stat. 2372. In 2018, Congress enacted the First Step Act, which made the changes retroactive and gave courts authority to reduce the sentences of those affected by the altered offenses. Pub. L. 115–391, 132 Stat. 5194. Section 404 of the First Step Act states, in relevant part:

> (a) DEFINTION OF COVERED OFFENSE. In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372), that was committed before August 3, 2010.
>
> (b) DEFENDANTS PREVIOUSLY SENTENCED. A court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372) were in effect at the time the covered offense was committed.

First Step Act § 404. As both parties acknowledge, relief under the First Step Act is discretionary. *Id.* § 404(c) ("Nothing in

this section shall be construed to require a court to reduce any sentence pursuant to this section.")

The Government opposes the Motion. As a threshold matter, the Government argues that Hoover's mandatory life sentence for engaging in a continuing criminal conspiracy under 21 U.S.C.§ 848 is not eligible for a sentence reduction. Eligibility under Section 404 of the First Step Act is determined by the defendant's statute of conviction. *United States v. Shaw*, 957 F.3d 734, 735 (7th Cir. 2020). Specifically, "if a defendant was convicted of a crack-cocaine offense that was later modified by the Fair Sentencing Act, he or she is eligible to have a court consider whether to reduce the previously imposed term of imprisonment." *Id.*

Hoover's mandatory life sentence and conviction for continuing in a criminal conspiracy rests on 21 U.S.C. § 848(b) and § 848(c), which states:

> (b) **Life imprisonment for engaging in continuing criminal enterprise**
> Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a), if--
> (1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and
>
> (2)(A) the violation referred to in subsection (c)(1) involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title, or

>(B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 841(b)(1)(B) of this title.
>
>(c) **"Continuing criminal enterprise" defined**
>For purposes of subsection (a), a person is engaged in a continuing criminal enterprise if--
>(1) he violates any provision of this subchapter or subchapter II the punishment for which is a felony, and
>
>(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II—
>
>(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
>
>(B) from which such person obtains substantial income or resources.

21 U.S.C. § 848. Based on the text of the statute, conviction of a criminal conspiracy enterprise offense is dependent, both explicitly on Section 848(b) and implicitly on Section 848(c), on statutory penalties modified by section 2 or 3 of the Fair Sentencing Act of 2010. *Id.* § 848(b)("[S]ubsection 841(b)(1)(B)"); § 848(c)("[A]ny provision of this subchapter or subchapter II the punishment for which is a felony").

At sentencing, this Court adopted the Presentence Report and found that Hoover qualified for a mandatory life imprisonment sentence based on Section 848(b)(2)(A), having sold approximately 4.5 kilograms of crack per day, as well as Section 848(b)(2)(B),

having grossed over $100 million per year from crack cocaine sales. The Government acknowledges that Hoover's mandatory life sentence is based on sales of crack cocaine as described in Section 841(b)(1)(B), but argues that, because this Court found an independent basis for Hoover's mandatory life sentence based on the financing portion of the statute, it lacks the ability to review Hoover's sentence under the First Step Act.

This reasoning is now contrary to the law of this Circuit. *See United States v. Hudson*, 967 F.3d 605, 610 (7th Cir. 2020). In *Hudson,* the Seventh Circuit consolidated three defendants' appeals and reversed the district courts' holdings that a district court was not authorized under the First Step Act to "reduce a sentence for (a) a non-covered offense that is grouped with a covered offense; or (b) a covered offense when the defendant's Guidelines range was ultimately unaltered by the Fair Sentencing Act." *Id.* at 607. The Seventh Circuit reaffirmed that the purpose of the First Step Act makes a defendant "eligible to have a court consider whether to reduce the previously imposed term of imprisonment" notwithstanding the other components that led to the original sentence. *Id.* at 609–11 (citing *United States v. Shaw*, 957 F.3d 734, 738 (7th Cir. 2020)). As a result, the Court finds that it is authorized to consider Hoover's sentence under the First Step Act.

The Court next determines whether or not to exercise its discretion to resentence Hoover. In doing so, the Court considers the factors listed in 18 U.S.C. §§ 3553(a) and 3661. These statutes direct the Court to focus on whether the current sentence is "not greater than necessary," considering the need for the sentence to reflect the seriousness of the offense, the need to promote respect for the law, to provide just punishment, afford adequate deterrence to criminal conduct, to protect the public from further crimes, to provide the defendant with needed treatment in the most effective manner, the kinds of sentences available, the range established for the applicable category of defendant as set forth in the current guidelines, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). The Court considers Hoover's background, character, and conduct in this evaluation. 18 U.S.C. § 3661.

There is no question that Larry Hoover is one of the most notorious criminals in Illinois history. It is evident from Hoover's decades-long history of operating the Gangster Disciples, including from prison, as well as the most recent attempt by a Gangster Disciples' leader to contact Hoover, that he possesses great intelligence, leadership ability, and social capital. It is

equally clear, however, that Hoover used these skills to perpetuate violence, circulate illegal drugs, and recruit others to join his pursuit of crime and mayhem. These offenses are grave and deadly serious. As the overseer of a continuing criminal enterprise, Hoover attempted to create law unto himself and construct an organization in direct opposition to the American social contract. Further, Hoover is renowned and celebrated to this day by the Gangster Disciples. To the extent that any one person can deter another to commit crimes, Hoover's life imprisonment symbolically demonstrates that the rule of law reaches even those in power who seem untouchable.

Hoover argues that he is old, that these crimes are old, and that the Government's allegations of his continued renown are baseless. Hoover's briefing further argues that even if claims of his continued influence are true, Hoover disclaims responsibility for the people who celebrate his birthday in memory of him, or for current gang members who trade on his name or attempt to contact him. Instead, Hoover wishes to spend the remainder of his days quietly with his wife, children, and grandchildren. While Hoover might disclaim responsibility for the Gangster's Disciples' actions in his legal documents, Hoover does not argue that he has publicly recanted his prior actions as leader of the Gangster's Disciples or otherwise renounce his membership. He does not cite

to any regret that he has for the deaths he caused or show remorse for the countless drugs he put on the street, the addictions he perpetuated, and the resulting deaths of others' wives, children, and grandchildren throughout the state of Illinois and beyond. In his Illinois Parole Board Interview, as well as in the briefings for this Motion, Hoover ratifies his belief that his control of the Gangster Disciples had redeeming qualities that at least equaled whatever unfortunate criminal conduct resulted from the Gangster Disciples. Hoover's rehabilitative conduct consists of the hours and hours of continuing education. The Court recognizes this accomplishment and credits this work as proof of Hoover's dedication and ambition. Hoover's rehabilitative efforts, however, do not show a voluntary change of behavior.

As part of the decision to resentence, the Court also considers the need to protect the public from further crimes. At this time, Hoover still has a life sentence pending in the Illinois state court system based on convictions for ordering two murders in the early 1970s. The Court thus considers whether transference back to the IDOC would protect the public from future crime. Unlike almost all other inmates, the Court cannot assume that Hoover would be equally prevented from attempting further crime in state prison, which underscores the unusual nature of Hoover's position.

As the situs of his previous crimes, Hoover's relocation to state prison would be riskier than the average transfer of an inmate. Indeed, the federal convictions for which he is currently serving a life sentence is based in part on his continued operation of the Gangster Disciples while incarcerated in an IDOC facility. Since Hoover's federal conviction, the Illinois state prison system has developed a Central Intelligence Unit which specifically combats gang crime within the state prison system. Further, to the extent that the IDOC has reservations about its ability to protect the public from Hoover, it has made arrangements for Hoover to stay in the federal prison system even if Hoover enters Illinois state custody. (Supp. Resp. at 2, Dkt. No. 1286.) The Government notes that, in state custody, Hoover could petition the Illinois Parole Board for release, which potentially allows for his release into the general public. While Hoover argues he is too old to have contacts or any connections with the criminal world and would be unable to partake in the criminal activity, the Court notes that Hoover's unusual position also extends to his relative likelihood to commit further crimes. Unlike most people, Hoover's federal criminal convictions were based on his ability to convince others to commit illegal acts on his behalf. It is not clear to the Court that this particular skill decreases with age.

These, in summary, are the reasons to keep the sentence undisturbed. The Court also considers the portions of Section 3552 which would weigh in favor or reconsidering Hoover's sentence. First, the Court considers the range of sentences available and the range eligible for Hoover's type of conduct. If the Court extends its discretion to resentence Hoover, the resentencing would be made based on current sentencing guidelines under the Fair Sentencing Act. In the operative superseding indictment, the Government did not charge Hoover with a specific amount of crack cocaine or proceeds from that crack cocaine. As a result, the jury did not find, beyond a reasonable doubt, that Hoover did, in fact, trade in the amounts alleged by the Government and Probation at sentencing.

Since Hoover's sentence, the Supreme Court has held that "the indictment must allege, and a jury must unanimously find, that the offense involves that threshold amount before a court may sentence a defendant to the life term authorized by § 841(b)(1)(A)." *United States v. Mansoori*, 426 F.Supp. 3d 511, 519 (N.D. Ill. 2019) (citing *Apprendi v. New Jersey*, 530 U.S. 466, 476–79 (2000); *see also Alleyne v. United States*, 570 U.S. 99 (2013). As a result, Hoover would no longer have a mandatory life sentence. Instead, under Section 848(a), Hoover would receive between no "less than 20 years" and "up to life imprisonment." 21 U.S.C. § 848(a). His

other non-mandatory concurrent sentences would be similarly affected by the lack of a jury-ratified conviction on the specific amounts of drugs sold. As Hoover has been in prison for 25 years, the Court could sentence Hoover to as low as 20 years, which, with the mandatory five-year addition, would be approximately the length of Hoover's current incarceration in Federal custody.

As noted by Hoover in his Motion, the Court has considered similar petitions by many of his co-defendants and has determined that a resentencing is appropriate. More broadly speaking, the Fair Sentencing Act is a mechanism enacted by Congress to reduce the disparity between the crack cocaine and powder cocaine sentences. When making its decision, the Court is cognizant that defendants with similar records and guilty of similar conduct have already been released or will not receive a life sentence based on the offense charged by the Government in Hoover's case.

The Court agrees that Hoover's punishment is particularly grim and lacking in rehabilitative opportunities. It is difficult for Hoover to receive rehabilitative treatment when subject to such extreme isolation. As noted by the parties, the Bureau of Prisons provides the "Step Down" program, but Hoover has not yet availed himself of the administrative remedies available to improve his opportunities. He has submitted insufficient evidence for the Court to find that it is rare, arbitrary, or political.

Although the Court considered all of the above factors, the Court declines to extend its discretion to resentence Defendant Hoover. Because Hoover's crimes have always been ones of persuading others to follow out his commands, the Court is concerned that there is an active risk of harm if his resentencing causes his release from prison. Additionally, Hoover has not yet used the Bureau of Prisons' processes to request the opportunity to prove rehabilitation through lower security confinement. Hoover points out that the Court has exercises its discretion to some of his co-defendant. (*See Order as to Johnny Jackson*, Dkt. No. 1225; *Order as to Jerry Strawhorn*, Dkt. No. 1293; *Order as to Tirenzy Wilson*, Dkt. No. 1295.) However, Hoover's situation is unique in that he was the unquestionable leader of the criminal enterprise, while his co-defendants were quite obviously followers.

It is yet untested whether or not the Court has additional opportunities to exercise its discretion on Hoover's sentencing at a later time under the First Step Act. As such, the Court denies the Motion without prejudice, and defers any determination on the question of its capabilities to reconsider to a later time.

**CONCLUSION**

For the reasons stated herein, Larry Hoover's Motion for Relief Under the First Step Act (Dkt. No. 1232) is denied without prejudice.

Harry D. Leinenweber, Judge
United States District Court

Dated: 7/6/2021