# Exhibit B

```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE MIDDLE DISTRICT OF TENNESSEE
2                              AT NASHVILLE

3        UNITED STATES OF AMERICA        )
                                         )
4                                        )
         v.                              )
5                                        )   Case No.
         [1] MARCUS TERMAINE DARDEN      )   3:17-cr-00124
6        [2] MAURICE DUNCAN BURKS        )
         [5] DERRICK LAMAR KILGORE       )
7        [6] ELANCE JUSTIN LUCAS         )
         [7] DECARLOS TITINGTON          )
8

9

10      - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
11
                          BEFORE THE HONORABLE
12
             WAVERLY D. CRENSHAW, JR., CHIEF DISTRICT JUDGE
13
                              TRANSCRIPT
14
                                 OF
15
                             PROCEEDINGS
16
                           April 11, 2019
17
                          Trial Volume 24
18      - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
19
20              APPEARANCES ON THE FOLLOWING PAGES
21

22

23      PREPARED BY:
                      LISE S. MATTHEWS, RMR, CRR, CRC
24                       Official Court Reporter
                         801 Broadway, Room A839
25                        Nashville, TN 37203
                     lise_matthews@tnmd.uscourts.gov
```

```
 1   APPEARANCES:

 2   For Plaintiff USA:        John Benjamin Schrader
                               U.S. Attorney's Office
 3                             (Nashville Office)
                               Middle District of Tennessee
 4                             110 Ninth Avenue, S
                               Suite A961
 5                             Nashville, Tennessee 37203-3870

 6                             Ivana Nizich
                               Shauna S. Hale
 7                             Department of Justice
                               Organized Crime & Gang Section
 8                             950 Pennsylvania Avenue, NW
                               Washington, DC 20530
 9
     For Marcus Darden:        George Travis Hawkins
10                             Hawkins Law Firm, PLLC
                               340 21st Ave N
11                             Nashville, Tennessee 37209

12                             James E. Mackler
                               The Mackler Law Firm, PLLC
13                             718 Thompson Lane
                               Suite 108 - 438
14                             Nashville, Tennessee 37204

15   For Maurice Burks:        John M. Bailey IV
                               330 Franklin Road
16                             Suite 135A-427
                               Brentwood, Tennessee 37027
17
                               Eileen M. Parrish
18                             3200 West End Avenue
                               Suite 500
19                             Nashville, Tennessee 37203

20   For Derrick Kilgore:      Jack L. Byrd
                               Jack Byrd, PLLC
21                             300 James Robertson Parkway
                               Suite 301
22                             Nashville, Tennessee 37201

23   For Elance Lucas:         Robert Lynn Parris
                               Robert L. Parris, Attorney at Law
24                             200 Jefferson Avenue
                               Suite 1500
25                             Memphis, Tennessee 38103
```

```
1    APPEARANCES:   (CONTINUED)

2
     For Elance Lucas:          David I. Komisar
3                               800 Broadway
                                3rd Floor
4                               Nashville, Tennessee 37203

5
     For DeCarlos Titington:  David M. Hopkins
6                             David M. Hopkins, Attorney at Law
                              745 S Church Street
7                             Suite 303
                              Murfreesboro, Tennessee 37130
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2                    Thursday, April 11, 2019

3

4                    INDEX OF PROCEEDINGS

5                                              PAGE

6   PROOF FOR DEFENDANT DARDEN                   19

7   PROOF FOR DEFENDANT BURKS                    37

8   PROOF FOR DEFENDANT KILGORE                  38

9   PROOF FOR DEFENDANT LUCAS                    38

10  PROOF FOR DEFENDANT TITINGTON                87

11  PLAINTIFF REBUTTAL PROOF                     88

12

13                    INDEX OF WITNESSES

14
    WITNESSES:                                 PAGE
15

16  TERRY MINTON
        DIRECT EXAMINATION BY MR. HAWKINS        20
17      CROSS-EXAMINATION BY MR. SCHRADER        31

18  WALLACE "GATOR" BRADLEY
        DIRECT EXAMINATION BY MR. KOMISAR        39
19      CROSS-EXAMINATION BY MS. HALE            56
        REDIRECT EXAMINATION BY MR. KOMISAR      81
20
    JOSEPH UPTON
21      REBUTTAL DIRECT EXAMINATION BY MS. NIZICH    89
        REBUTTAL CROSS-EXAMINATION BY MR. KOMISAR   141
22
    AMY KELLEY
23      REBUTTAL DIRECT EXAMINATION BY MS. HALE     154
        REBUTTAL CROSS-EXAMINATION BY MR. KOMISAR   178
24      REBUTTAL CROSS-EXAMINATION BY MR. HOPKINS   197
        REBUTTAL REDIRECT-EXAMINATION BY MS. HALE   201
25
```

1   invading people's privacy rights.

2            So let's -- let's wrap up this witness.  Let's do

3   your next witness.  Tell him -- you know, on the off chance

4   you change my mind, tell him not to go far.

5            MS. NIZICH:  I have no redirect of this witness.

6   So we'll be done.

7            THE COURT:  We just have to do it on the record.

8            (Jury present.)

9            THE COURT:  Any redirect?

10           MS. NIZICH:  No, Your Honor.

11           THE COURT:  All right.  You can step down.

12                  (Witness dismissed.)

13           THE COURT:  Okay.  Call your next witness.

14           MS. HALE:  Thank you, sir.  The United States

15  calls Amy Kelley.

16           COURT DEPUTY:  Please raise your right hand.

17

18                        AMY KELLEY,

19  called as a witness by Plaintiff, was duly sworn and

20  testified as follows:

21

22           COURT DEPUTY:  Please be seated.

23           Please pull the microphone close, state your full

24  name and spell your last name.

25           THE WITNESS:  Amy Kelley, K-e-l-l-e-y.

154

REBUTTAL DIRECT EXAMINATION

BY MS. HALE:

Q.    Good afternoon, ma'am.

      How are you employed, Ms. Kelley?

A.    I am employed by the Federal Bureau of Prisons.

Q.    And what is your title at the Bureau of Prisons?

A.    I am currently an SIS, or special investigative
services, lieutenant.

Q.    And which facility do you work at?

A.    At the Administrative Maximum U.S. Penitentiary in
Florence, Colorado.

Q.    Is that known as the ADX --

A.    Yes.

Q.    -- Supermax?

A.    Yes, ma'am.

Q.    How long have you been employed at the ADX Supermax?

A.    I began my employment in 2012.

Q.    And what are your duties as a lieutenant with the -- did
you say Special Investigative?

A.    Services.  SIS.

Q.    Services.  SIS?

A.    Yes.

Q.    What are your duties with the Special Investigative
Services of the ADX facility?

1   A.   Pretty broad investigative duties to include inmate

2   investigations, liaisoning with the FBI for criminal

3   investigations, as well as staff investigations.

4   Q.   As a part of your duties as a lieutenant with SIS, do

5   you also keep and maintain records of inmates and their stay?

6   A.   Yes, ma'am.

7   Q.   What sort of -- at ADX Supermax, like most prisons, are

8   inmates allowed to have visitors?

9   A.   Yes, ma'am.

10  Q.   And are records of those visitations and those visitors

11  kept by you and others in your like position?

12  A.   Yes.  We keep records as far as video, audio.

13       There's noncontact visiting.  So there is no

14  contact visiting whatsoever at the ADX.

15  Q.   Do you also keep records and maintain records of monies

16  that inmates receive to their commissary?

17  A.   Yes, ma'am.

18  Q.   And do you also keep records of contacts and phone calls

19  that inmates make?

20  A.   Yes, ma'am.

21       MS. HALE:  Your Honor -- I'm sorry.

22  BY MS. HALE:

23  Q.   Ms. Kelley, if you would look in that book at

24  Government's Exhibit 5780.

25  A.   Okay.

574f3dfa8859e061

```
1   Q.    That is a multipage document, correct, ma'am?
2   A.    Yes, ma'am.  65 pages.
3   Q.    And do you recognize that document?
4   A.    Yes.
5   Q.    And what is it?
6   A.    So essentially this is from our True Access system.
7   It's our application in which we track all these things,
8   whether it's timeline, phone lists, addresses, visits,
9   contact list.  All of those contacts have to be approved that
10  are on here, by my department.  But essentially this will
11  break down every monetary deposit, withdrawal from any
12  inmate's account.  It's titled an Inmate Center's Report.
13  Q.    And as a part of your duties as a lieutenant in SIS, do
14  you help maintain those records?
15  A.    Yes, ma'am.
16  Q.    And do you rely on those records?
17  A.    Yes.  Every day.
18  Q.    And are those records kept within the normal course of
19  the business of the Bureau of Prisons?
20  A.    Yes.
21              MS. HALE:  Your Honor, at this time the United
22  States would offer into evidence Government's Exhibit 5780.
23              THE COURT:  Admitted.
24              (Whereupon Government Exhibit 5780 was marked for
25              identification and received in evidence.)
```

1  BY MS. HALE:

2  Q.    Now, Ms. Kelley, let's talk about what is a Supermax.

3  A.    Okay.  We are the only Supermax prison in the Bureau of

4  Prisons for the federal government.  We house gang members,

5  high ranking gang members, cartel members, terrorists,

6  anybody that requires our level of communication monitoring

7  or physical constraint.

8  Q.    Now, at the ADX facility, are there any other

9  classifications of prisoners at that complex?

10  A.    Yes, ma'am.

11  Q.    And can you explain to the jury what the different types

12  of classifications are within the Bureau of Prisons?

13  A.    Yes.  So we have a -- four different institutions on our

14  complex in Florence.  So we have the federal prison camp.  So

15  it's our minimum security inmates.  We have the Federal

16  Correctional Institution, the FCI.  That houses low and

17  medium inmates.  We have the United States Penitentiary.

18  That houses our high and some max.  And then the ADX, which

19  is the fourth, where I am currently assigned.  And that holds

20  our max inmates.

21  Q.    And is the ADX Supermax facility, is that built

22  underground?

23  A.    No, ma'am.

24  Q.    Can you explain how -- how that facility is set up?

25  A.    Okay.  It -- so you enter through the administrative

1  building.  Obviously, security procedures.  You go through

2  security.  And then you make your way down into the

3  institution.  There is a portion of it where you walk through

4  a control center, sally port, but it's -- none of the

5  facility is underground.

6  Q.    I'm sorry?

7  A.    None of the facility is underground.

8  Q.    And inmates who are housed at the Supermax, what types

9  of restrictions do you all maintain for those inmates?

10 A.    So those inmates are 100 percent monitored, their

11 communication.  Of course, privileged/legal correspondence is

12 that.  It's privileged.  So we cannot monitor that unless

13 those restrictions are placed on those inmates.  So every

14 phone call, every piece of mail, general correspondence, is

15 monitored by my office.

16 Q.    And when you say "monitored," what do you mean?

17 A.    So we have specific technicians, SIS technicians, who

18 monitor different groups of individuals.  They read all of

19 their mail.  They listen to all of their phone calls.  They

20 listen to all their visits.  And they act as the

21 investigative branch within the institution.

22 Q.    Can you explain the visitation process for inmates at

23 the ADX Supermax?

24 A.    Sure.  So every inmate has to submit a visitation form

25 for every visitor.  So the inmate will send out a visitation

1  form to the potential visitor.  They will fill it out, asking

2  questions such as criminal background, history, where they

3  live, address.  That will be sent back into our office.  A

4  background check is ran on that individual.  And they are

5  approved on a case-by-case basis.

6  Q.    Lt. Kelly, can you explain to the jury what it would

7  take for an applicant for visitation to be rejected as an

8  applicant at the ADX?

9  A.    So again, case-by-case basis, but a common rejection

10  that we see is somebody that's not truthful on their

11  application.  So if they were to lie about criminal history,

12  we pull the background check, and it shows there's a false

13  statement on that document, we will reject that visitation.

14  Q.    Is an inmate by the name of Larry Hoover housed at ADX

15  Florence?

16  A.    Yes, ma'am.

17  Q.    And can you explain to the jury how long Mr. Hoover has

18  been housed there?

19  A.    He was sent to the ADX in 1998, I believe.

20  Q.    Now, we talked about generally phone monitoring and

21  contact monitoring.  Is Mr. Hoover on -- or has he been on

22  any type of special monitoring for his phone calls?

23  A.    He has been on -- we call them general correspondence

24  restrictions.

25  Q.    And what is a general correspondence restriction?

1    A.    So there's different options on that form.  And it's
2    done at the local level.  We can restrict his phone
3    conversations, his mail, who it goes to.  Specifically, we
4    can place on there -- if he gets on the phone and does --
5    commits a prohibited act, he gets written an incident report,
6    and we can prohibit him from contacting that person up to six
7    months.  And then that is reviewed every six months.
8    Q.    Is Mr. Hoover's -- are Mr. Hoover's phone calls listened
9    to by a live person contemporaneous to his calls?
10   A.    Yes.  He actually is live monitored by my department.
11   Most other calls are live monitored by our towers.  But he is
12   live monitored by my office directly.
13   Q.    Why is he live monitored directly by your office?
14   A.    Due to committing prohibited acts while using the phone
15   or the mail system, he was placed on the SIS live monitor.
16   So his phone is actually shut off in between calls and can
17   only be turned on by my office.
18   Q.    Lt. Kelly, during the course of your employment at the
19   ADX, do you personally monitor Mr. Hoover?
20   A.    Yes, I have.
21   Q.    And are there other high ranking gang members at the ADX
22   Florence?
23   A.    Yes, there are.
24   Q.    As a part of your duties with ADX Florence, have you
25   attempted to educate yourself about the Gangster Disciples?

1    A.    Yes.

2    Q.    Why is that important, ma'am?

3    A.    It's important to know structures, history; basically,

4    to understand the individuals that we are working around.

5    Monitoring their communications is key in knowing what their

6    lifestyle is about, how they structure themselves, and how

7    they structure those around them.

8    Q.    And what steps have you taken to learn about Gangster

9    Disciples?

10   A.    Any kind of historical data that we can read.  I've

11   frequently read the Blue Print, which is a Gangster Disciples

12   manual of some sort.  Historically, we have found that in

13   Hoover's cell and other Gangster Disciple members' cells at

14   the ADX.  All those documents are very important in

15   understanding their communication styles, their coded

16   language, and their principles.

17   Q.    How has the Blue Print -- actually, what is the Blue

18   Print, ma'am?

19   A.    So the Blue Print is -- so the Gangster Disciples have

20   two different methods.  So we have the 360, which is the

21   original gang constitution.  So that is -- I guess you would

22   call it -- or how we hear it at the ADX during visits is the

23   street side of everything, the gang colors flying, the gang

24   activity, the dealing drugs.  And then the Blue Print is

25   almost a parallel to that gang constitution, 360

1  constitution.  The Blue Print they reference as the 720

2  concept.  That concept is identical, although some of the

3  language has changed in it.  You still have your gang

4  symbols, the six star, the six points.  It still references

5  folc nation.  However, it changes, and it's referenced

6  directly in visitation recently with Hoover as the political

7  side of Growth & Development or Gangster Disciples

8  interchangeably.

9  Q.   Lt. Kelley, who is Diane Cooper?

10 A.   Diane Cooper is Mr. Hoover's -- sorry -- sister.

11 Q.   And who is Wendy Jenkins?

12 A.   That is his common law wife.

13 Q.   And who is Miranda Goodloe?

14 A.   That is an individual who he used to date and had a son

15 with.

16 Q.   And are all of those people on his visitation list?

17 A.   Yes, ma'am.

18 Q.   Is his mother also on his visitation list?

19 A.   Yes.  Odell.

20 Q.   You said that recently you all have observed or

21 intercepted conversations about the Blue Print?

22 A.   Yes, ma'am.

23 Q.   And who was that with?

24 A.   Inmate Hoover had a visit actually with his son Larry

25 Hoover, Jr., his older son Larry Bernard, and Wendy Jenkins,

1    and that was discussed.

2    Q.    And how recently was this?

3    A.    That conversation was last fall.  2018.

4    Q.    If we could take a look at Government's Exhibit 5780.

5    And starting with this first page, Lt. Kelley, what are we

6    looking at here?

7    A.    So this is the Inmate Center Report.  It's breaking down

8    the monetary deposits into inmate Hoover's account.

9    Q.    And how long have you been monitoring Larry Hoover?

10   A.    I began my employment in the SIS department as an SIS

11   technician in 2014.

12   Q.    And so do these records go back a number of years?

13   A.    Yes, they do.

14   Q.    And do the records contain periods prior to your

15   personal monitoring of Larry Hoover?

16   A.    Yes.  I believe they go back to 2012.  I can look.  So

17   the farthest back is 2010.

18   Q.    And what happened in 2010?

19   A.    The system was integrated into the Bureau of Prisons for

20   use --

21   Q.    And -- I'm sorry.  Go ahead.

22   A.    For use.  It was integrated in the system.

23   Q.    So you all got a new system?

24   A.    Yes, ma'am.

25   Q.    And so if we look at the third from the bottom, W.

1  Griffin.

2  A.   Yes, ma'am.

3  Q.   Starting on 9/1/2018.  Just generally -- actually, I'm

4  sorry.

5        If we could go out and look at the top

6  "Transaction Date," "LOC," "Transaction Type."  Let's talk

7  about what these columns indicate.

8        What does the "Transaction Date" mean?

9  A.   So that was the date the money was placed on inmate

10 Hoover's account.

11 Q.   And LOC?

12 A.   Is the location.  So FLX would be the federal Florence

13 complex.

14 Q.   And "Trans Type"?

15 A.   It's the type of way they deposited the money, whether

16 it's Western Union or the federal lockbox in Des Moines,

17 Iowa.

18 Q.   What are the different ways to put money on -- in

19 someone's commissary within BOP?

20 A.   So you can either send the Western Union or the lockbox

21 in Des Moines, Iowa.  Money can be sent there, and it is

22 placed on the inmate's account there.

23 Q.   And can money come from all over the country to that

24 lockbox?

25 A.   Yes, ma'am.

1  Q.   And the "Amount"?

2  A.   Yep, the amount, that's the dollar amount that's being

3  deposited onto his account.

4  Q.   "Sender NM"?

5  A.   The sender name.

6  Q.   What does "Address" indicate?

7  A.   So that will be the physical address if it is placed on

8  the Western Union or lockbox deposit.

9  Q.   Is it not required to be --

10 A.   It is not.

11 Q.   What about "City," "State," "Zip" and "Phone"?

12 A.   Just that.  It's the city, state, and zip in which that

13 was sent from, and then the phone number that's associated if

14 they placed that on the deposit as well.

15 Q.   And Lt. Kelley, are there any restrictions within ADX on

16 who can send money to inmates?

17 A.   There are not.

18 Q.   So anyone can send money?

19 A.   Yes.

20 Q.   Are there times when -- within the course of your duties

21 at BOP -- that you actually take money from an inmate's

22 commissary?

23 A.   Yes.  So there's two different ways that we can do that.

24 If we deem that funds are from elicit activity, gang

25 activity, or inmate to inmate, possibly, in an investigation,

1    we can either -- one, we can encumber that money, which means
2    we remove that money from their account, and it's placed on
3    hold.  We can also place the entire account -- so if an
4    inmate continually has infractions where they're receiving
5    money from elicit activities or inmate-to-inmate directed, we
6    can place that account on what we call administrative hold.
7    And that holds every deposit from going in until it's
8    reviewed.  So we can do two different things.  But, yes, we
9    have done both frequently.
10   Q.   And have you done both to Larry Hoover's account?
11   A.   Yes, we have.
12   Q.   If we could take a look at the third from the bottom,
13   9/1/2018, W. Griffin.
14           Lt. Kelley, who is W. Griffin?
15   A.   It's Warren Griffin, also known as GG.
16   Q.   And was the money that Warren Griffin sent to Larry
17   Hoover, was that encumbered by your office?
18   A.   Yes, it was.
19   Q.   Why?
20   A.   Because he was arrested on charges, and we were aware
21   that he was currently in jail.
22   Q.   So he -- what does that mean?
23   A.   So he was awaiting trial.  So he did not make this
24   deposit.  Somebody else used his name and information to make
25   that deposit on his behalf.

1  Q.   Lt. Kelley, in your review of these records -- or do

2  these records indicate that Mr. Hoover is receiving money

3  from all over the country?

4  A.   Yes.  It does.

5  Q.   Does Mr. Hoover also send money to his family from the

6  money in his commissary?

7  A.   Yes, he does.

8  Q.   If we could take a look at page 13 of this exhibit.  If

9  we can go down to the middle, starting at "money sent."

10          Can you explain these boxes, Lt. Kelley?

11 A.   Yep.  The same, so "Transaction Date," that's the date

12 in which we trans- -- the transaction took place.  The inmate

13 can fill out what we call BP 199 form, in which he can

14 deposit money to other individuals outside of prison.  So

15 here, transaction date is 3/19.  The time that we did that,

16 the location it originated from, the Florence complex.  The

17 inmate can actually write into that form what it's for, the

18 purpose of it.  So he wrote "gift."  And he sent that out to

19 Diane Cooper, who is his sister, in Chicago.

20 Q.   And do you also keep as records the phone calls that

21 Mr. Hoover makes?

22 A.   Yes, ma'am.  So the phone calls are recorded on here as

23 far as when they take place.  And they are recorded into your

24 system for six months.  If they are not locked manually by

25 one of us, they will purge from the system after six months.

1   Q.    If we can go to page 26 of this document.  If we can
2   start at the top, just explaining the columns.
3   A.    Okay.  So "start date," that's the date in which the
4   call was made, the time.  Location, again, that's the
5   Florence complex.  If the call was completed.  So if somebody
6   else picked up the phone on the other side.  They do have to
7   answer a prompt saying that they're aware they're talking to
8   a federal inmate and that it's being recorded.  The duration.
9   So all of our calls are up to 15 minutes.  After 15 minutes
10  they will automatically cut off.  The phone number that is
11  dialed.  All those phone numbers have to be preapproved by
12  one of my staff.  The contact first name, last name, city,
13  and state.
14  Q.    And why did you say Mr. Hoover's calls are live
15  monitored, ma'am?
16  A.    Because he continues to break rules.  He uses the phone
17  specifically -- social phone calls and social visitation to
18  conduct gang activity.
19  Q.    In recent years, Lt. Kelley, what, if any, gang-related
20  sanctions has Mr. Hoover received at your facility?
21  A.    So we have different levels of disciplinary hearing
22  officer, DHO, sanctions.  He has, I believe, received two 335
23  level incident reports; level 100 being the most severe, 200
24  in the middle, 300.  That's how they code them for the Bureau
25  of Prisons.  But he received a 335 gang communication twice,

1  and then I believe he also received a 296, circumventing our

2  mail monitoring procedures.

3  Q.    When was the most recent disciplinary action for a gang

4  communication for Mr. Hoover?

5  A.    I believe it was in the last two years that he received

6  the 335 gang communication.

7  Q.    2017?

8  A.    Yes.

9  Q.    Do you recall generally what that discipline action was

10 about?

11 A.    I do not.  I do know about the 2015 a little bit more.

12 Q.    So there was one in 2017?

13 A.    Yes.

14 Q.    And was there also one in 2015?

15 A.    Yes, ma'am.

16 Q.    What was the one in 2015?

17 A.    So that incident report stemmed from a visit in which he

18 had with Adrain Jackson, who is a known Gangster Disciple

19 member now, where he had a visit with Mr. Jackson and

20 Ms. Wendy Jenkins, his common law wife, at the ADX, and he

21 discussed gang activities.

22 Q.    If we could go to page 32 of this exhibit.  And at the

23 bottom.  What are we looking at here, Lieutenant?

24 A.    So this is his approved visiting list.  Again, lists the

25 visitor's name, relationship, city, state, zip code, and

1    phone number associated.  The alpha code all the way to the

2    right, the "FLM" stands for the Supermax or the M.

3    Q.    And can we go to Adrain Jackson's name at the bottom.

4    At one point, Lt. Kelley, was Adrain Jackson a contact for

5    Mr. Hoover?

6    A.    Yes, he was.

7    Q.    He was allowed to visit?

8    A.    He was.

9    Q.    And was there, in fact, a visit by Mr. Jackson?

10   A.    Yes, there was.

11   Q.    And when did that occur?

12   A.    I believe it was September of 2015.

13   Q.    If we could go to page 34.  And about three-quarters of

14   the page way down.  When did Mr. Jackson visit Mr. Hoover at

15   the ADX?

16   A.    So that was September 19th, 2015.

17   Q.    And did he visit Mr. Hoover with any of Mr. Hoover's

18   family members?

19   A.    Yes.  So this -- this report indicates when the visits

20   occurred and who was logged into our system of visiting.  So

21   Ms. Wendy Jencks was there, as well as Larry Hoover, Jr.

22   Q.    So what was it about that visit that caused Mr. Hoover

23   to get a gang communication discipline?

24   A.    So during that conversation, I believe it was over a

25   three-day span, he discussed gang activities, gang meetings

1    that were occurring on the street, and all sorts of various

2    topics surrounding known gang members.

3    Q.    And Lt. Kelley, why does that matter?  Why does that get

4    you disciplined at ADX?

5    A.    It should get anybody disciplined, but coming from the

6    national leader of the Gangster Disciples, it's very serious

7    as far as what he says, how he says it, who he says it to,

8    which is why he is at the ADX, to monitor his communications.

9    Q.    And you said he also received a 296 discipline?

10   A.    Yes, ma'am.

11   Q.    And when was that?

12   A.    I believe that was May of 2015, just a few months before

13   this.

14   Q.    And what was the basis of that disciplinary action?

15   A.    So conducting cell searches, we had inmate Hoover,

16   inmate Dobbins, who released from federal prison.

17   Q.    Who is inmate Dobbins?

18   A.    Inmate Anthony Dobbins.  He is a Gangster Disciple

19   member, also, who released to East St. Louis, but is

20   currently back in custody.

21   Q.    So what happened between those two?

22   A.    So during these cell searches, we recovered a coded

23   cipher, as well as a dictionary, in which they were using to

24   write out coded communication.

25   Q.    You said a coded cipher?

1    A.    Yes, ma'am.

2    Q.    What is that?

3    A.    So what was found is a Merriam dictionary, a pocket

4    dictionary.  One was found in Mr. Dobbins' cell and one was

5    found in Mr. Hoover's cell.  There was actually instructions

6    on how to use this code.  So in inmate Dobbins' cell, there

7    was a ton of legal court cases written out longhand.  And

8    then instead of having actual court numbers behind the cases,

9    he was changing those numbers and using them as page number,

10   word number.  And then we found the instructions with that

11   during that search, describing how to use the code, that they

12   could utilize it to get around our monitoring procedures.  It

13   was in Mr. Dobbins' handwriting, but it did explain to

14   Mr. Hoover how to write this code, and that he would be able

15   to communicate on his behalf to the outside world using that

16   code.

17   Q.    What would -- why does that cause someone to be

18   disciplined?

19   A.    Because that would be circumventing our monitoring

20   procedures, in which they would be able to communicate things

21   of which we are unaware of.

22   Q.    Does that present a safety issue?

23   A.    Absolutely.

24   Q.    Who is Gregory Schell, Lt. Kelley?

25   A.    He is a Gangster Disciples member and co-chairman,

1    right-hand man to Mr. Hoover.

2    Q.    If we could take a look at page 12 of this exhibit.    And

3    if we could go to the line that reads 10/15/2011.

4              What are we looking at here, Lt. Kelley?

5    A.    That is a deposit placed into inmate Hoover's account by

6    Adrain Jackson.

7    Q.    And how much money did Mr. Jackson put in on October

8    15th, 2013?

9    A.    That was a $50 deposit.

10   Q.    If we could go to page 11.  2/25/2012.  What are we

11   looking at the -- the entry that's at 5:04:05 p.m.,

12   Lt. Kelly?

13   A.    That is another $50 deposit made by Adrain Jackson.

14   Q.    If we can go to page 9.  If we start with the cluster at

15   the top.

16   A.    Okay.  So on 11/21, 5:04, there's a $400 deposit by

17   Adrain Jackson, another $400 deposit or 11/4/2013, 400 on

18   10/27/2013, 400 on 10/16/2013, 800 on 9/24/2013, another 800

19   deposit on 7/5/2013.

20   Q.    On that same page, if we could go to April 22nd.  What

21   are we looking at there, ma'am?

22   A.    It is a $1,200 deposit by Adrain Jackson onto

23   Mr. Hoover's account.

24   Q.    If we can go to page 8.  And start at the top of the

25   page at March 2nd.

1  A.    That's a $500 deposit by Mr. Jackson.

2  Q.    If we could go down on that same page to an entry that

3  starts December 31st.

4  A.    Another $500 deposit by Mr. Jackson.

5  Q.    And further on that page, on October 29th.

6  A.    $500 deposit.

7  Q.    And also on that page, at June 29th.

8  A.    So you have a $500 deposit on June 29th, also.

9  Q.    And finally at the bottom cluster.

10 A.    You have a $500 deposit on March 27th, 2014.  February

11 27th, 2014, $400.  February 8th, 2014, $400.  January 24th,

12 2014, $400.

13 Q.    And page 7.  If we can go to October 29th.

14 A.    A $500 deposit by Mr. Jackson.

15 Q.    And Lt. Kelley, was that October 29th deposit shortly

16 after his visit -- Mr. Jackson's visit that caused

17 Mr. Hoover --

18 A.    Yes.

19 Q.    -- to be disciplined?

20 A.    Following the September visit, yes.

21 Q.    In 2016, do you know if something happened to

22 Mr. Jackson?

23 A.    He was indicted in a large RICO case down in Atlanta, I

24 believe.

25 Q.    And now, Lt. Kelley, we talked about Mr. Hoover being

1  able to send money to his family?

2  A.   Yes, ma'am.

3  Q.   And based on the amount of money that he has in his

4  commissary, is he able to send large amounts of money to his

5  family?

6  A.   He is able to send large amounts of money.

7  Q.   I'm sorry?

8  A.   He is, yes.

9  Q.   If we could go to page 16.  And start -- I'm sorry.  And

10  if we can start at -- I'm sorry.  14.  Sorry.  If we could

11  start at the entry that begins May 15th, 2015.

12  A.   Okay.  So he sent $450 out to Miranda Goodloe.

13  Q.   And who is that?

14  A.   She was a previous girlfriend who he fathered a child

15  with, Tyree Hoover.

16  Q.   And did he send other monies to her on that same day?

17  A.   Yes, he did.  So he did a total of one, two, three --

18  four deposits, two being $450 -- sorry.  All four being $450.

19  Q.   And is there an entry on September 2nd, 2014 to

20  Ms. Goodloe?

21  A.   For $2,000, yes.

22  Q.   And if we can go down on that page to April 16th, 2014.

23  A.   Another $2,000 deposit to Ms. Goodloe.

24  Q.   And do we also see on that page other large deposits?

25  A.   Yes.  There are several for $495, also to Ms. Goodloe.

1  Q.   Lt. Kelley, are you aware of someone named Walter Gator

2  Bradley?

3  A.   Yes, ma'am.

4  Q.   And how are you aware of that person?

5  A.   He was a Gangster Disciple member -- or is a Gangster

6  Disciple member.  He was very involved during the beginning

7  of the Gangster Disciple nation in Chicago.  He was very

8  close to inmate Hoover during the inception.

9  Q.   And Lt. Kelley, how long have you been monitoring, you

10  personally listening, to Larry Hoover's phone calls?

11  A.   That would date back to 2014.

12  Q.   And in your time of personally monitoring Larry Hoover's

13  calls, have you ever heard or seen a call to Walter Gator

14  Bradley?

15  A.   No, ma'am.

16  Q.   When inmates at the ADX make a phone call, are they

17  allowed to talk to other people other than who's on their

18  approved list?

19  A.   No.  They are strictly approved through our office.

20  Q.   So what would happen if, let's say, an inmate is talking

21  to someone on the approved list, and then they give the phone

22  to someone else?

23  A.   Their call will be disconnected.

24  Q.   Was Walter Gator Bradley ever on Mr. Hoover's approved

25  contact list?

1   A.   Not during my time monitoring him.

2   Q.   And Lt. Kelley --

3          MS. HALE:  Actually, may I have one moment, Your

4   Honor?

5          THE COURT:  Sure.

6   BY MS. HALE:

7   Q.   I believe I said Walter Bradley.  I meant to say Wallace

8   Bradley.

9   A.   Wallace Gator Bradley.

10   Q.   You know that name?

11   A.   Yes, ma'am.

12   Q.   Even though I said the wrong name?

13   A.   Yes.

14   Q.   I'm sorry?

15   A.   Yes.

16   Q.   Lt. Kelley, in your capacity as a lieutenant over the

17   SIS unit, and in your capacity as personally monitoring Larry

18   Hoover over these last five years or so, do you have evidence

19   that the Gangster Disciples street gang continues as a

20   national entity?

21   A.   Yes, ma'am.

22          MS. HALE:  No further questions.

23          THE COURT:  All right.  Cross.

24          MR. HAWKINS:  No questions, Your Honor.

25          MS. PARRISH:  No questions, Your Honor.